IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SHANNA EILEEN MARIE MEYER,<br><br>  Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>  Defendant. | CASE NO. 3:23-cv-1541<br><br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Shanna Meyer filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income. This court has jurisdiction under 42 U.S.C. §§405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural background**

In August 2020, Meyer filed an application for Supplemental Social Security Income Benefits alleging a disability onset date of February 1, 2016.[1] Tr. 15, 105. In pertinent part, Meyer claimed that she was disabled and limited

---

[1]  "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

in her ability to work due to, among other conditions, narcolepsy,[2] fibromyalgia,[3] chronic migraines, major depressive disorder, generalized anxiety disorder, excessive daytime sleepiness, chronic fatigue syndrome, IBS with constipation, and chronic pain syndrome. Tr. 106. The Commissioner denied Meyer's application initially and upon reconsideration. Tr. 130, 138.

In May 2021, Meyer requested a hearing. Tr. 142. Administrative Law Judge ("ALJ") Patricia Carey held a telephonic hearing in June 2022. Tr. 35. Meyer appeared, testified, and was represented by counsel at the June 2022 hearing. Tr. 35–71. Qualified vocational expert Michael Klein also testified. Tr. 35–71. In August 2022, the ALJ issued a written decision, which found that Meyer was not entitled to benefits. Tr. 15–29.

In August 2022, Meyer appealed the ALJ's decision to the Appeals Counsel. Tr. 234–35. In June 2023, the Appeals Counsel denied Meyer's appeal, making the ALJ's August 2022 decision the final decision of the Commissioner. Tr. 1–3; *see* 20 C.F.R. § 404.981.

---

[2]     Narcolepsy is a chronic neurological disorder that disturbs an individuals sleep cycles and is characterized by daytime sleepiness or suddenly falling asleep during an activity. *Narcolepsy*, MAYO CLINIC DISEASES & CONDITIONS, https://www.mayoclinic.org/diseases-conditions/narcolepsy/symptoms-causes/syc-20375497 [https://perma.cc/W28R-7JWT].

[3]     Fibromyalgia is a disorder that is characterized by widespread pain that is accompanied by fatigue, sleep, memory, and mood issues. See *Fibromyalgia*, MAYO CLINIC DISEASES & CONDITIONS, https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780 [https://perma.cc/69JY-8UMK].

Meyer timely filed this action in August 2023. Doc. 1. In it she asserts the following legal issues:

1. The ALJ erred when she failed to properly apply the criteria of Social Security Ruling 12-2p and support her finding regarding Plaintiff's fibromyalgia and related symptoms with substantial evidence.

2. The ALJ erred when she failed to properly apply the criteria of Social Security Ruling 14-1p and support her finding regarding Plaintiff's chronic fatigue syndrome and related symptoms with substantial evidence.

3. The ALJ erred when she failed to properly evaluate Plaintiff's migraine headaches at Step Three of the Sequential Evaluation.

Doc. 8, at 1.

**Evidence**

*1. Personal and Vocational Evidence*

Meyer was born in 1984, making her 34 years of age on her date last insured, and 31 years of age on the date of onset. Tr. 87, 105. She completed high school and attended three years of college but did not complete a degree program. Tr. 87, 112, 259.

*2. Medical Evidence[4]*

In April 2020, Meyer sought treatment for her migraines. Tr. 523. She stated that she got headaches daily and had about 12 migraines per month. Tr. 523. Meyer stated that the medication Emgality previously helped, and she

---

[4]    The recitation of medical evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

again was prescribed this medication "to control the 12 migraines she has a month." Tr. 523.

In June 2020, Meyer met with her psychiatrist Ryan Travis, M.D. Tr. 503. Dr. Travis noted that Meyer "feels very exhausted some days being worse than others." Tr. 503. He also noted that she was "trying to get up early and start working on things" and "trying to stay active with her kids going for walks or swimming in the pool." Tr. 503. He added that she spent time with a friend who came over to visit and who helped her keep up with household chores. Tr. 503.

In September 2020, Meyer met with Dr. Travis who noted that she complained of exhaustion and struggled to complete daily responsibilities. Tr. 509. Dr. Travis noted a medical history of anxiety, excessive daytime sleepiness, fibromyalgia, irritable bowel syndrome, migraine, borderline narcolepsy, and recurrent major depression in partial remission. Tr. 510. Dr. Travis prescribed Ritalin as a stimulant to address Meyer's diagnosis of narcolepsy due to medical condition without cataplexy. Tr. 513.

In October 2020, Meyer met with Mark W. Seymour, LPCC,[5] who noted that Meyer described herself as very tired and exhausted. Tr. 662. Meyer described that she woke up early to take care of her children and that she looked forward to her children being in school five days a week again. Tr. 662.

---

[5]     LPCC is a professional designation that stands for Licensed Professional Clinical Counselor.

Seymour noted that Meyer reported continued severe pain, constipation, exhaustion, and other chronic medical problems. Tr. 662. Meyer was encouraged to continue working with her physicians and to take good care of herself. Tr. 663.

In November 2020, Meyer again met with Seymour who noted she was pleasant, anxious, sad, overwhelmed, and frustrated. Tr. 658. He also noted that Meyer reported an energy boost with the prescribed Ritalin. Tr. 657. He also noted that she was attentive, cooperative, open, coherent, goal-oriented, and oriented with "adequate" memory. Tr. 658.

Also in November 2020, Khader Mustafa, M.D., performed a fibromyalgia evaluation. Tr. 654. Dr. Mustafa noted that Meyer was an established patient, who had been treated since April 2018 but was last seen in August 2020. Tr. 654.

In December 2020, Seymour noted that Meyer had "a decline in functioning with worsening exhaustion and fatigue to where she is needing help from other people to get things done around the house." Tr. 649. At the same appointment she was also "lucid, alert, and oriented" and her mood was pleasant, anxious, sad, and frustrated with congruent affect. Tr. 649–50. Her depression and anxiety were described as "moderate," but she was noted as moving slowly and exhausted. Tr. 649.

Also in December 2020, Dr. Travis noted that Meyer's response to current medications was "fair" and that an adverse side effect possibly from

her medication was "excessive fatigue." Tr. 651. Meyer was noted as alert and oriented but did appear fatigued. Tr. 653.

In February 2021, Dr. Travis noted that Meyer "continue[d] to struggle on a daily basis with excessive fatigue." Tr. 687. He noted that she felt behind on household responsibilities, but she tried to catch up on her household responsibilities or spend time with her kids. Tr. 687. Dr. Travis indicated that Meyer was on a "strong combination of antidepressant and stimulant medications." Tr. 687. He also discussed the possibility of a second opinion or seeing an additional psychiatrist to discuss treatment options not available through his office. Tr. 687.

In March 2021, Dr. Mustafa treated Meyer in a follow-up fibromyalgia appointment. Tr. 681. He noted that she was alert and oriented to person, place, and time. Tr. 683. Additionally, he noted that Meyer had normal thought content and behavior. Tr. 683.

Also in March 2021, Seymour continued to provide outpatient behavioral health treatment to Meyer. Tr. 677. Meyer reported that her headaches were more "tolerable" but that she continued to be tired and struggled with chronic pain. Tr. 678. Seymour noted that Meyer stated she "has been 'trying to stay busy,' but that she needs to 'take lots of naps.'" Tr. 678. Seymour noted that Meyer discussed her relationship with one of her daughter's fathers and celebrating her eldest daughter's birthday at a waterpark. Tr. 678. Meyer was attentive, cooperative, and open. Tr. 678. She

was oriented to person, place, and time and presented with a pleasant, anxious, and sad mood. Tr. 678–679. But she was also noted as "tired with chronic pain issues, appearing neat with bags under her eyes. Tr. 678.

Meyer continued treatment with Seymour throughout March 2021. Tr. 679. He noted that she had "bad headaches and a lot of pain" and that Meyer reported "no significant progress of any kind." Tr. 680. He also noted that Meyer was using a "very effective parenting strategy" to address behavior concerns about her eldest daughter and that Meyer has "met someone new," who is "very much a gentleman." Tr. 680. Meyer's mood was pleasant, anxious, sad, and frustrated. Tr. 680. Meyer was noted as coherent and goal-oriented thought processes, oriented to person, place, and time, and to have adequate memory. Tr. 680.

In August 2021, Dr. Travis noted that Meyer was alert and oriented with normal psychomotor activity, but her mood was "down" and her affect was "flat." Tr. 1020. He noted that her speech had normal rate and volume, and her thought processes were goal-oriented and intact. Tr. 1020. He further noted that Meyer's attention was "intact," her memory was "generally intact", and her "insight/judgment" was "intact." Tr. 1020. Meyer described that she "continue[d] to feel about the same" and struggled with depression and energy. Tr. 1017. Dr. Travis indicated that her symptoms have "changed very little," so they explored alternative treatments and reviewed genetic testing results.

7

Tr. 1017. Meyer indicated interest in treatment with Spravato for her resistant depression. Tr. 1017.

In September 2021, Meyer had a telehealth consultation with Dr. Rajiv Parinja to discuss potential Spravato treatment. Tr. 1634–1640. In October 2021, Meyer began treatment with Spravato, a dose of esketamine administered under supervision by a medical professional to address her treatment-resistant depression. Tr. 1628–1633. Dr. Parinja's notes indicated that Meyer received Spravato treatments until March 2022. Tr. 1494, 1485–1640.

In October 2021, Meyer went to the emergency room with complaints of weakness and dizziness and was diagnosed with acute viral syndrome. Tr. 849; *see also* Tr. 937 (record of emergency room visit). Meyer had slept 23 out of 24 hours and cut a counseling session short. Tr. 849. It was noted that Meyer was not taking prescribed medication because she did not have a cough or congestion. Tr. 849. It was also noted that Meyer appeared chronically ill. Tr. 850.

In January 2022, Seymour noted that Meyer continued to struggle with memory issues, missing a counseling appointment because she had forgotten. Tr. 988. Meyer described that she was exhausted, and her exhaustive episodes tended to last for about five days but that she tried to push herself when she could. Tr. 989. Meyer stated that her family had a good Christmas and described her daughter's improved attitude. Tr. 989. Meyer indicated that she

8

still communicates with a gentleman via text, but that they have not seen each other since before Christmas. Tr. 989.

In February 2022, Christy A. Fitzpatrick, APRN-CNP,[6] treated Meyer for a wellness visit. Tr. 844. Nurse Practitioner Fitzpatrick noted that Meyer's physical examination was normal. Tr. 846. She also noted that Meyer's fibromyalgia and chronic fatigue syndrome were treated by pain specialists. Tr. 846. Meyer's migraine and narcolepsy were noted as "stable." Tr. 846.

In March 2022, Meyer continued to describe pain and exhaustion in her psychiatric appointments with Dr. Travis. Tr. 968. Dr. Travis discussed whether her condition was "primarily psychological" and Meyer's frustration with her lack of response to treatments. Tr. 968. Dr. Travis noted that Meyer was tearful, but she had "good" alertness, orientation, speech, thought process, associations, thought content, attention, memory, insight, and judgment. Tr. 971–72. Also in March 2022, Meyer described to Seymour that she had "really bad" headaches every day but that they were not quite as bad as migraines. Tr. 977. Meyer also stated that she wondered if she suffered from "somatic symptom disorder" since she did not respond to medication as desired. Tr. 977.

---

[6]     APRN-CNP is a professional designation that indicates the practitioner is a Certified Nurse Practitioner and Advanced Practice Registered Nurse.

In April 2022, Meyer sought treatment for neck pain. Tr. 882. It was noted in Meyer's examination that she had decreased sensation in the right C5[7] dermatomal distribution. Tr. 885.

In May 2022, Dr. Mustafa examined Meyer related to her fibromyalgia Tr. 1040–1044. She had tender trigger points, with no synovitis. Tr. 1043. He noted that she was alert and oriented with normal thoughts and behavior. Tr. 1043. Dr. Mustafa referred Meyer for an electromyography to evaluate her hands and address complaints of pain and weakness, in particular pain in her right shoulder. Tr. 1072. The examination revealed a very minimal median neuropathy on the right, consistent with carpal tunnel syndrome. Tr. 1074–1076.

Also in May 2022, Dr. Travis noted that Meyer had poor focus, cognitive impairment, needed things repeated numerous times, was socially limited by anxiety, and had difficultly setting goals. Tr. 1094. He also noted that Meyer felt her "exhaustion is the most problematic factor prevent[ing] her being able to work." Tr. 1094. Dr. Travis noted moderate retardation to Meyer's psychomotor status, "fair" attention such that she was able to attend

---

[7]    C5 refers to part of an individual's cervical spine. Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources,                 https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT].

"reasonably well," and fair memory such that she was able to recall events "reasonably well." Tr. 1097–1098.

In June 2022, Meyer had a pain management appointment to address chronic neck and back pain in addition to headaches. Tr. 1756. Meyer described that "some headache [was] always there" but the "pain level varies." Tr. 1756. On examination, she was alert, oriented, and attentive with no obvious problems of memory, reasoning, or intellect. Tr. 1758. Meyer had tenderness and limited range of motion of her spine but she had normal strength and sensation throughout her body. Tr. 1758.

Also in June 2022, Meyer returned to the emergency room with complaints of fatigue. Tr. 1728–30. Meyer was released without any follow up plan or diagnosis. Tr. 1731.

### 3. Opinion Evidence

#### 3.1 State Agency Opinions

In November 2020, state agency consultant Gerald Klyop, M.D., evaluated Meyer's residual functional capacity (RFC).[8] Tr. 109–111. Dr. Klyop found that Meyer was capable of light work, with the following limitations: never climbing ladders, ropes, or scaffolds, frequently climbing stairs, stooping,

---

[8]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

kneeling, crouching, and crawling. Tr. 110 Dr. Klyop also opined that Meyer should avoid exposure to all hazards. Tr. 111.

Also in November 2020, state agency consultant Kristen Haskins, Psy.D, evaluated Meyer's mental residual functional capacity. Tr. 111. Dr. Haskins found no limitations to Meyer's memory. Tr. 111. Dr. Haskins found moderate limitations in Meyer's ability to: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. Tr. 111–112. No other significant limitations were noted. Tr. 111–112.

In May 2021, state agency consultant Rannie Amiri, M.D., considered Meyer's file on reconsideration. Tr. 119–120. Dr. Amiri found that Meyer was capable of light work with the following limitations: never climbing ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl. Tr. 119. Dr. Amiri opined that Meyer was limited in her ability to reach with both arms in all directions and that she was limited to frequent handling and fingering. Tr. 120. Dr. Amiri also opined that Meyer "should avoid concentrated exposure to environmental irritants as well as operating heavy/hazardous machinery and unprotected heights." Tr. 120.

Also in May 2021, Irma Johnston, Psy.D., assessed Meyer's mental residual functional capacity. Tr. 121. Dr. Johnston affirmed the prior mental residual functional capacity. Tr. 121.

3.2   *Function Reports*

In October 2020, Meyer completed a Function Report. Tr. 271–278. In it she stated

> [m]y conditions haven't gotten any better and continue to progressively worsen. I get severe and debilitating migraines. I can no longer drive to chronic fatigue and narcolepsy. I take several naps throughout the day to get thru every day. I was missing a lot of work due to my conditions due to chronic pain and fatigue. I could no longer do light office work so I left my job in Feb. 2016. I have not been able to return to work as the fatigue is getting worse every year. I can't sit or stand for more than 10 mins at a time. I have no energy most days to get out of bed, dress, or bathe. On a bad day I stay in bed and sleep the entire day and can sleep at night because that fatigue is so bad.

Tr. 271. Meyer completed a second Function Report in March 2021, which again described the difficulties arising out of her fatigue and pain. Tr. 298–305.

Meyer's sister also completed a Function Report in May 2022. Tr. 330-333. Meyer's sister stated that Meyer was limited in her ability to work due to "extreme exhaust[ion] and pain" and because she "needs rest and naps." Tr. 330.

### 4. *Hearing Testimony*

Meyer, represented by counsel, testified in a telephonic hearing in June 2022. Tr. 35. Meyer testified that she lives with her two daughters. Tr. 41. Meyer explained that she can care for herself for the most part, but her daughters will help her. Tr. 43. She stated that she needs to hold onto something when walking up and down stairs. Tr. 41. Meyer stated that she is divorced and that she paid bills with child support and credit cards. Tr. 41.

Meyer testified that she is left-handed and that she had completed some college. Tr. 42. Meyer had experience from on-the-job training when she worked in an accounting department for a long time. Tr. 42. She confirmed she can read, write, and sign her name. Tr. 42. She also confirmed that she can figure out change and operate a bank account. Tr. 42. Meyer testified that she has a valid driver's license and that sometimes people will drive her, but she sometimes drives as well. Tr. 43.

Meyer next testified regarding her employment history. Tr. 43. Meyer stated that the last job she worked was in November of 2015, as an accounting specialist. Tr. 43. She described that her position allowed her to sit mostly, and she lifted only paper files. Tr. 44. Meyer next testified that from 2013 to 2014 she worked as a payroll clerk. Tr. 45. The ALJ described Meyer's past work experiences as "composite job of payroll clerk, DOT[9] 215.382-014, SVP of 4,

---

[9] DOT stands for the Dictionary of Occupational Titles. It is a standard classification of occupations established by the Social Security Administration.

sedentary," as "composite position in cashier, DOT 211.462-010, SVP of 2, at light." Tr. 45.

Meyer stated her "severe chronic fatigue and chronic pain issues are very debilitating," which prevent her from working. Tr. 46. She explained that she goes in and out of sleep during the day and then has difficulty sleeping at night. Tr. 46. Meyer stated that she is irritated by everything and frustrated by noise, light and sounds. Tr. 46. She also stated that she has "severe chronic migraines, daily." Tr. 46. Meyer later stated that "I have a headache every single day. It's just how bad it is today." Tr. 61. Meyer described mobility issues due to "carpal tunnel in [her] right hand." Tr. 46. She also detailed memory issues, which made it difficult to take directions and process simple commands when she is given them. Tr. 46. Meyer stated that she often lost count when counting to ten. Tr. 46. Meyer described that her medication caused her to feel sleepy and nauseous. Tr. 47. She also stated that her mental health "is also taking a toll on [her] body." Tr. 47.

Meyer described her pain as "always a six out of ten on the pain scale, if not a ten, most days" and that she cannot stand for very long because her feet hurt. Tr. 47. She later estimated that her six was probably a normal person's ten. Tr. 61. Meyer also stated that she walked and stretched as much as she

---

The DOT includes descriptions of the physical demands, environmental factors, and skill levels for various occupations.

can tolerate, but that she cannot walk very far and was sensitive to humidity and extreme weather. Tr. 47–48.

Meyer confirmed that she worked with different sleep specialists who attributed her fatigue to her fibromyalgia, but she also stated that "nobody is really giving me, really, any answers." Tr. 48. Meyer described that she and her psychiatrist discussed whether she was experiencing a somatic symptom disorder, but that she did not complete an assessment or treatment. Tr. 49–51.

Meyer described full body pain symptoms. Tr. 52. She also described that she had "depressive episodes" or got "really frustrated" and that she had "really bad anxiety." Tr. 52. Meyer stated she had gastrointestinal issues which were sometimes triggered by her mental health. Tr. 52–53. She later testified that she has "IBS with constipation." Tr. 60. Additionally, she explained that she tried to do what she can, but when she pushed herself too hard, she had to rest for several days. Tr. 53.

Meyer explained that her pain and sleep issues had gone on for 15 years. Tr. 53. After the birth of her second child, however, her mental health "spun out of control." Tr. 53. Meyer explained that she "ended up quitting" her job because she would need to nap during the day but stated "they were trying to fire me at the same time." Tr. 54.

Meyer also discussed her parenting challenges and the assistance that her children and their fathers provided. Tr. 55–57. Meyer explained that her children do not do all of the chores, but "they do help." Tr. 57. She stated that

her "goal every day is to do one small chore," but that "a load of dishes takes me like three days to get through because it's just so difficult for me." Tr. 57.

Meyer stated that she can walk "maybe 10 minutes, 15 minutes at a time." Tr. 57. And that she can lift a gallon of milk. Tr. 57. Meyer stated that on a typical day she will be awake from 3:00 p.m. to 9:00 p.m. and "go in and out of consciousness" throughout the day. Tr. 58. She explained that she will cook something simple for herself and her daughters and then go to bed by 9:30 p.m. Tr. 58.

Meyer stated that she was not involved in any churches, groups, or organizations and had no hobbies. Tr. 58. She also stated that she does not often use the internet or her phone. Tr. 59. She stated that she has never had problems with drugs or alcohol. Tr. 59.

5. *Vocational Expert Testimony*

Vocational expert Michael A. Kline testified in the telephonic hearing. Tr. 63. The ALJ first posed the following hypothetical for Kline:

> [An] individual of Claimant's age, education, relevant vocational background. We're going to begin at the light exertional level. She can do light work, except she can occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds. She can occasionally stoop, defined as bending at the waist, kneel, crouch, defined as bending at the knees, and crawl. She can never climb ladders, ropes, and scaffolds. She is limited to frequent reaching in all directions, handling and fingering with the bilateral upper extremities, are also at frequent. She is to avoid all unprotected heights and dangerous moving machinery. She is to avoid concentrated exposure to irritants, such as fumes,

17

> odors, dust and gases. She is to not to do work at more than a moderate noise level. She can do no work in extreme humidity. She can do simple routine, and repetitive short cycle work that does not require fast-paced production demands, such as moving assembly lines and conveyer belts, involving only work-related decisions. She can do work with static duties where changes are infrequent and can be explained and implanted over time to allow her time to adjust. She can do no commercial driving. She can have occasional interaction with the general public, co-workers, and supervisors.

Tr. 64-65.

Kline testified that this first hypothetical individual would not be able to perform any past work because all of Meyer's past work was skilled work. Tr. 65. He stated, however, that there would be other jobs at the light-work level that could be done. Tr. 65. Specifically, he stated that the positions of produce weigher, laundry bagger, and retail marker would be available. Tr. 65.

The ALJ next asked Kline to assume a second hypothetical person with all the same limitations as the first hypothetical but limited to sedentary work. Tr. 66. Mr. Kline testified that, while no past work would be available, the positions of order clerk, document preparer, and charge account clerk were available at the sedentary work level. Tr. 66.

The ALJ's third hypothetical asked whether certain actions, such as: (1) lying down during the workday, outside of normal breaks; (2) being off task more than 10% of the workday; (3) missing more than two days per month; and (4) taking unscheduled breaks, would be work preclusive. Tr. 67. Kline stated that all would be work preclusive. Tr. 67.

18

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since August 19, 2020, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: fibromyalgia; migraine headaches; chronic fatigue syndrome; irritable bowel syndrome/gastritis; generalized anxiety disorder; neuropathy right wrist; somatic symptom disorder (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds. She can occasionally stoop defined as bending at the waist, kneel, crouch (defined as bending at the knees) and crawl. She is limited to frequent reaching in all directions, handling and fingering with the bilateral upper extremities are also at frequent. She is to avoid all unprotected heights and dangerous moving machinery. She is to avoid concentrated exposure to irritants such as fumes, odors, dust and gasses. She is to not do work at more than a moderate noise level. She can do no work in extreme humidity. She can do simple, routine and repetitive short cycle work that does not require fast paced production demands, such

as moving assembly lines and conveyor belts, involving only work related decisions. She can do work with statis duties where changes are infrequent and can be explained and implemented over time to allow her time to adjust. She can do no commercial driving. She can have occasional interaction with the general public, coworkers, and supervisors.

5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   The claimant was born [in 1984] and was 35 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education (20 CFR 416.964).

8.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

Tr. 17, 18, 22, 27, 28.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Analysis**

Meyer's counsel appears to raise arguments related to three distinct Social Security Rulings: 12-2p; 14-1p; and 19-4p. *See* Doc. 8, at 1. Under Ruling 12-2p, once it has been determined that a claimant has a medically determinable impairment of fibromyalgia, the Commissioner "will consider it in the sequential evaluation process to determine whether the person is disabled." SSR 12-2P (S.S.A.), 2012 WL 3104869, at *5 (July 25, 2012). Specifically, when assessing a claimant's RFC,

> we assess a person's RFC when a person's impairment(s) do[] not meet or equal a listed impairment. We base our RFC assessment on all relevant evidence in the record. We consider the effects of all the person's medically determinable impairments, including impairments that are 'not severe.' For a person with [fibromyalgia], we will consider a *longitudinal record* whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'

23

*Id.* at * 6 (emphasis added).[10]

Under Ruling 14-1p, once it is established that a person has the medically determinable impairment of chronic fatigue syndrome, the Commissioner will "consider this MDI in the sequential evaluation process to determine whether the person is disabled." SSR 14-1P (S.S.A.), 2014 WL 1371245, * 8 (Apr. 3, 2014). "For those impairments that do not meet or equal the severity of a listing, we must make an assessment of the person's RFC. … In assessing RFC, we must consider all of the person's impairment-related symptoms in deciding how such symptoms may affect functional capacities. The RFC assessment must be based on all the relevant evidence in the record." *Id.* at * 9.

Under Ruling 19-4p, primary headache disorder may constitute a medically determinable impairment if "established by objective medical evidence from an acceptable medical source." SSR 19-4P (S.S.A.), 2019 WL 4169635, * 2 (Aug. 26, 2019). Ruling 19-4p clarifies "[w]e will not use a person's statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an MDI" and "[w]e also will not make a finding of disability based on a person's statement of symptoms alone." *Id.* While a medically

---

[10]   "Longitudinal medical evidence refers to medical evidence covering a significant period that documents the claimant's medical history." *Program Operations Manual System, DI 22505.010 Developing Longitudinal Medical Evidence*, SOCIAL SECURITY ADMINISTRATION, https://secure.ssa.gov/poms.nsf/lnx/0422505010 [https://perma.cc/553L-ZYSK].

determinable impairment will not be established "based only on a diagnosis or a statement of symptoms," Ruling 19-4p explains that the Commissioner will consider a combination of findings reported by an acceptable medical source when primary headache disorder is established as a medically determinable impairment. *Id.* at *6. Ruling 19-4p recognizes that there is no listing for primary headache disorder, but references Listing 11.02, addressing epilepsy, and states that it "is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit *equivalent signs and limitations* to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we *may* find that his or her MDI(s) medically equals the listing." *Id.* at * 7 (emphasis added). Ruling 19-4p does not require that an individual with an MDI of primary headache disorder be found to equal paragraphs B or D of Listing 11.02.

Before addressing the substance of Meyer's argument, the Court notes that Meyer, through counsel, has conflated disparate arguments and made arguments in sections of her brief that are not reflected in the section heading for the section. Meyer's counsel has been warned before about her continued practice of lumping various challenges to different steps of the sequential disability evaluation together. *See, e.g.*, Case No. 5:21-cv-01721, Doc. No. 13, at 24, n.5 (filed 4/14/2022); Case No. 1:21-cv-00556, Doc. No. 19, at 34, n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. No. 19, at 34, n. 5 (filed 2/2/2022); see

also Case No. 5:20-cv-01340, Doc. No. 21, at 26, n. 9 (filed 8/16//2021); Case No. 1:20-cv-01186, Doc. No. 21, at 25, n. 8 (filed 8/16/2021). Additionally, the Court's Initial Order in this case requires that "[e]ach introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading. Failure to comply with this Requirement may result in … waiver of the arguments[.]" Doc. 4, at 3–4. Counsel's failure to present arguments in a way that the Court can address them, and Defendant can respond to them, has led the Court to deem certain arguments forfeited as described below.

1. Meyer's first argument heading states that the ALJ "erred when she failed to properly apply the criteria of Social Security Ruling 12-2p and support her finding regarding Plaintiff's fibromyalgia and related symptoms with substantial evidence." Doc. 8, at 9. In this portion of her brief, Meyer appears to make at least three distinct arguments. Some, but not all, of these arguments appear to be contemplated by Meyer's argument heading.

*First*, Meyer argues that the ALJ "failed to discuss [Ruling] 12-2p, beyond a brief statement that Plaintiff's 'fibromyalgia does not reach the level of medical equivalence to meet a listing.'" Doc. 8, at 9. Meyer's first argument indicates that she believes the ALJ erred in her evaluation at Step Three because Meyer mentions "equivalence to meet a listing." Meyer, however, does not elaborate on her argument beyond the conclusory statement that the ALJ's statement at Step Three was insufficient. Doc. 8, at 9. So she has forfeited this

argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted). Additionally, Meyer's subheading contains no indication that a Listing argument will be raised. This argument, thus, does not comply with the Court's Initial Order. *See* Doc. 4, at 3–4. Therefore, the argument has been forfeited.

*Second*, Meyer argues that the "ALJ erroneously failed to consider the longitudinal record documenting Plaintiff's symptoms, especially her complaints of related depression, hypersomnia/fatigue, and pain." (citations omitted). Doc. 8, at 9. The Court assumes that this argument is based on Ruling 12-2p because Ruling 12-2p provides that the longitudinal record will be considered whenever possible. SSR 12-2p, 2012 WL 3104869 at *6. Ruling 12-2p explains how the longitudinal record should be considered when assessing a claimant's RFC. *Id*. Thus, as far as the Court can tell, Meyer takes issue with the evidence considered by the ALJ in rendering her RFC determination.

But Meyer does not substantiate her assertion that the ALJ did not consider the longitudinal record with citation to the ALJ's decision. And a reading of the ALJ's decision reveals that the ALJ considered the entire record of medical evidence in rendering her decision. Tr. 22; *see also* Tr 23–27 (identifying a selection of medical evidence and testimony and summarizing

that Meyer's symptoms "could reasonable cause some symptoms and limitations" but that Meyer's "allegations are considerably broader and more restricted than is established by the medical evidence"). The fact that Meyer can cite record evidence that may support her desired outcome does not show that the ALJ failed to consider evidence of her symptoms contained throughout the record. *Jones*, 336 F.3d at 477 (even if a claimant can show substantial evidence in support of their position, the ALJ's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ"). This argument is thus meritless.

*Third*, Meyer appears to argue that the ALJ erred by finding that Meyer's activities were inconsistent with her allegations of pain and fatigue. Doc. 8, at 11. Meyer has not identified a particular part of the sequential evaluation for fibromyalgia, as outlined in Ruling 12-2p, that the ALJ allegedly erred in applying. Instead, Meyer generally argues that the ALJ's analysis of the record to assess Meyer's RFC and evaluate the criteria at Steps Four and Five was improper. Doc 8, at 11. Meyer does not develop this argument with citation to the ALJ's decision. Perhaps this is because the ALJ's decision shows that the ALJ considered both the record and Meyer's subjective statements. *See e.g.*, Tr. 24 (explaining that Meyer's statements about intensity, persistence, and limiting effects were inconsistent because she claimed to be unable to do anything due to pain and fatigue, yet the record showed she could

care for two daughters, attend appointments, date, visit a water part, and travel to her sister).

Meyer's statement that "subjective symptom complaints may support a disability finding when objective medical evidence confirms the alleged severity of the symptoms," Doc. 8, at 11 (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)), is of little aid to her argument. As outlined by the ALJ, some of the objective evidence showed that Meyer experienced chronic pain, however, other objective evidence showed that she lived an active and engaged lifestyle. *See* Tr. 24–27. It was fully within the ALJ's purview to weigh this competing evidence as she saw fit. 20 C.F.R. § 404.1520c(a) (explaining how the ALJ will consider and weigh medical opinions and prior administrative medical findings); *see also Gill v. Comm'r of Soc. Sec.*, No. 1:22-cv-00981, 2023 WL 4078193, * 16 (N.D. Ohio April 24, 2023) ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony–that's the ALJ's job.") (quoting *Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020)). This argument is thus meritless.

2.     Meyer's next argument heading states that the ALJ erred by failing "to properly apply the criteria of Social Security Ruling 14-1p and support her finding regarding plaintiff's chronic fatigue syndrome and related symptoms with substantial evidence." Doc. 8, at 12. By the Court's count, five separate arguments are raised in this portion of Meyer's briefing. This

approach prevents the court from appropriately addressing her arguments and violates the Court's Initial Order. *See* Doc. 4.

*First*, Meyer appears to argue that the ALJ failed to properly apply Ruling 14-1p by finding Meyer's chronic fatigue was not medically equivalent to any listing. Doc. 8, at 12. But Meyer fails to identify any specific aspect of Ruling 14-1p that was not applied or that was improperly applied by the ALJ. Doc. 8, at 12. Instead, Meyer provides is a list of evidence that, she states, "established the diagnosis of chronic fatigue." Doc. 8, at 12. It is unclear how this evidence supports an argument that Ruling 14-4p was not applied. Meyer has thus forfeited this argument by failing to sufficiently develop it for the Court to address. *See McPherson*, 125 F.3d at 995.

*Second*, Meyer appears to argue that the ALJ erred by failing to provide a limitation related to fatigue in her RFC. Doc. 8, at 14. Nowhere does Meyer's heading for this portion of her argument indicate that she took issue with the ALJ's RFC determination, as required by the Court's Initial Order. Doc. 4, at 3–4. And "[c]ounsel has been warned that if she continues to present arguments in this manner, the Court may deem an argument forfeited or impose other appropriate sanctions." *See, e.g., Zinn v. Comm'r of Soc. Sec.*, No. 1:23-cv-30, 2023 WL 6277864, at *11, n.11 (N.D. Ohio Sept. 11, 2023), *report and recommendation adopted*, 2023 WL 6276584 (N.D. Ohio Sept. 26, 2023). Because Meyer has not be properly raised any RFC argument, this argument is also forfeited. Even if this argument were considered, it is meritless because

the ALJ did address Meyer's fatigue in assessing her RFC. *See e.g.*, Tr. 27 (limiting Meyer to light work, in part, due to her "chronic fatigue syndrome" and imposing certain functional limitations based on the "symptoms and complaints related  to these conditions").

*Third*, Meyer appears to raise two arguments: (1) that the ALJ erred by "ignor[ing] relevant medical evidence" documenting her symptoms, Doc. 8, at 14, and (2) that "the ALJ's conclusions that her symptoms were not as severe as alleged … was in error as it was contrary to the medical evidence documenting that Plaintiff has fatigue related to her psychological and physical impairments." Doc. 8, at 15. These arguments allege distinct issues and fail for at least two reasons. First, Meyer's arguments do not clearly relate to any portion of Ruling 14-4p, as her argument heading indicates. *See* Doc. 4, at 3–4 (requiring argument headings reflect the substance of an argument and warning that failure to do so may result in waiver of an argument). Instead, these arguments appear to relate to the ALJ's assessment of evidence and limitations in Step Four of the sequential analysis. Because these arguments are not raised in a manner in which the court can properly address them, they are forfeited. Second, even if the Court did consider these two arguments, they are meritless because the ALJ's decision shows that the ALJ properly evaluated Meyer's subjective complaints and the objective medical evidence. *E.g.*, Tr. 22–27 (evaluating Meyer's testimony and the record of medical evidence as a whole to weigh the consistency of her subjective complaints and

31

assess appropriate functional limitations). These arguments are thus unavailing.

*Fourth*, Meyer again argues, with citation to *Blankenship*, that "subjective complaints may support a disability finding when objective medical evidence confirms the alleged severity of symptoms." Doc. 8, at 16. This argument again fails and, as far as the Court can discern, conflates distinct arguments. Meyer argues that the ALJ erred by finding that Meyer's symptoms were not as severe as alleged, not that the ALJ's violated any aspect of the guidance for evaluating a chronic fatigue condition under Ruling 14-4p. Additionally, Meyer does not show how the ALJ failed to consider the inconsistencies between her subjective complaints and medical evidence with any citation to the ALJ's decision. In fact, the ALJ explicitly did consider inconsistencies and those inconsistencies formed the basis for the ALJ's determination that the evidence showed Meyer's symptoms were not as severe as subjectively alleged. *See* Tr. 24, 27. This argument thus also fails.

*Fifth*, Meyer argues that the ALJ failed to "consider the limitations and restrictions imposed by all Plaintiff's severe and non-severe impairments" as required by Ruling 96-8p. Doc. 8, at 16–17. The Court can discern no relationship between this argument and the argument stated in Meyer's argument heading, which solely invoked Ruling 14-1p. This is the first time Ruling 96-8p is mentioned. Thus, this argument is improperly raised because

it bears no discernable relationship to the argument described in Meyer's heading. Doc. 4, at 3–4. This argument is also forfeited.

Even if the Court were to consider Meyer's fifth argument, it lacks merit. Meyer simply alleges, without any citation to the ALJ's decision, that the ALJ "continued through the Sequential Evaluation and failed to consider any effects related to [Meyer's] fatigue when forming her RFC." Doc. 8, at 17. In essence, Meyer is arguing that the ALJ failed to consider certain evidence. The ALJ stated that she considered the entire record. Tr. 22. Absent evidence to the contrary, the Court will presume that this statement is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Meyer has done nothing to show otherwise. And to the extent that Meyer is arguing that the ALJ's decision was not supported by substantial evidence, it was. The ALJ reasonably articulated the substantial evidence that supported her decision. Tr. 22–27. That Meyer can point to other record evidence that would support a different conclusion, neither shows that the ALJ's decision lacked support of substantial evidence nor shows that remand is required. *Jones*, 336 F.3d at 477 (even if a claimant can show substantial evidence in support of their position, the ALJ's decision

cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ"). This argument is therefore unavailing.

3.    Meyer's final argument section states that the ALJ "failed to properly evaluate Plaintiff's migraine headaches at Step Three of the sequential evaluation." Tr. 8, at 17.

Meyer argues that the ALJ "failed to discuss the frequency of the migraines in conjunction with Listing 11.02B." Doc. 8, at 19. She adds that the ALJ "failed to find that Plaintiff equaled Listing 11.02B based on the documented headaches." Doc. 8, at 19. Meyer cites about a page of medical evidence in support of her conclusion that "Plaintiff satisfied the criteria of Listing 11.02B." Doc. 8, at 19.  That evidence, however, is presented for the first time in this Argument section. The Court's Initial Order states, "[a]ll facts relevant to the legal issues and discussion must be set forth in the *Facts* section." Doc. 4, at 3. As a result, the evidence that Meyer cites to support this argument need not be considered. With the exclusion of this evidence, Meyer failed to properly present facts in support of her argument, and her argument fails.

Even if the merits of Meyer's argument were considered, the argument does not support remand. Meyer argues that the ALJ "failed to discuss the frequency of Meyer's migraines in conjunction with Listing 11.02B." Doc. 8, at 19. But Meyer does not cite any portion of Ruling 19-4p that *requires* such discussion. Meyer also cites *Harper v. Comm'r of Soc. Sec.*, No. 1:20cv1304,

2021 WL 2383833, at *12 (N.D. Ohio May 25, 2021) for the proposition that "the ALJ erred when she failed to find that Plaintiff equaled Listing 11.02B based on the documented headaches." Doc. 8, at 19. *Harper*, however, does not stand for the proposition that remand is required based on a failure to properly consider a claimant's impairment under Listing 11.02. In fact, Listing 11.02B is not mentioned once in *Harper*. Instead, the court in *Harper* identified that the ALJ provided "only a boilerplate conclusion after his short summary" of Harper's subjective symptom complaints. *Harper*, 2021 WL 2383833 at *12. The court, thus, reasoned that remand was proper because the ALJ's articulation of "why he discounted Harper's subjective symptom complaints regarding her migraine headaches was inadequate." *Id.* at *13.

By contrast, the ALJ here provided a detailed explanation of why Meyer's subjective symptom complaints were not entirely persuasive. Tr. 22–27. And the ALJ did address the frequency of Meyer's headaches when the ALJ identified that Meyer reported she had a bad headache every day but not as bad as when she had a migraine. Tr. 25.

Lastly, to the extent that Meyer argues that her headaches were not considered in the ALJ's assessment of limitations to Meyer's "ability to engage in substantial gainful activity on a full-time and sustained basis," this argument is improperly raised and otherwise lacks merit. Doc. 8, at 20–21. This argument is improperly raised because it pertains to Steps Four and Five of the sequential evaluation process, whereas this argument heading solely

35

contemplated a Step Three Listings argument. *See* Doc. 4, at 3–4 ("Each introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading. Failure to comply with this Requirement may result in … waiver of the arguments[.]"). This argument is thus forfeited.

Even if the Court did entertain this separate argument, it lacks merit. The ALJ explicitly included and explained limitations contained in Meyer's RFC related to her sensitivity to sound, light, and certain environments caused by her conditions. Tr. 26. (citing to hearing testimony in which Meyer described irritability and sensitivity to sound and humidity). So, not only is it clear that the ALJ considered Meyer's headache symptoms, but also it is clear that the ALJ accounted for these symptoms in assessing Meyer's RFC. As with much of Meyer's arguments, this argument is meritless.

**Conclusion**

For the reasons explained above, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated: April 17, 2024

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge
